IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| American Insurance Managers, Inc., *et al.*, | ) | |
| | ) | C/A No. 1:07-CV-1615-MBS |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Guarantee Insurance Company, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the Court on a motion to vacate or modify an arbitration award filed by Plaintiffs American Insurance Managers, Inc. ("AIM"), American Insurance Management Group, Inc., Atlanta Insurance Marketing, Inc., and Essex Holdings, Inc. (together, "Plaintiffs"), ECF No. 54, and a motion for judgment based on the same arbitration award filed by Defendants Guarantee Insurance Company ("Guarantee"), Steven M. Mariano, Lucia A. Tompkins, and Patriot Insurance Management Company, Inc. (together, "Defendants"), ECF No. 59. The Court heard argument on these motions on March 17, 2011. For the reasons that follow, the Court hereby **DENIES** Plaintiffs' motion to vacate or modify the award and **GRANTS** Defendants' motion for judgment.

I.      **BACKGROUND**

Plaintiff AIM is a Georgia corporation with its principal place of business in Atlanta, Georgia. Am. Compl. ¶ 1, ECF No. 25. In 2002, AIM began work on the AIM Workers' Compensation Program (the "AIM Program" or "Program"), which "was designed to allow qualified insurers to sell workers['] compensation insurance to Professional Employer Organizations

1

('PEO[s]')." Id. at ¶¶ 9–10. As Plaintiffs explain in the currently governing Amended Complaint, companies use PEOs to outsource the management of certain employee services such as payroll and employee benefits, including workers' compensation insurance. Id. at ¶ 10. However,

> [b]ecause of the significant problems associated with underwriting workers compensation coverage [including, for example, the fact that the number of employers or employees represented by a single PEO, as well as the risks associated with insuring the same, might change drastically within a coverage period], a substantial number of PEOs were unable to obtain affordable worker[s'] compensation coverage for [the] employers which they served. Other PEOs were unable to obtain coverage on any basis. As a consequence, many PEOs were either unable to provide full service to their employer clients, or were required to purchase coverage for workers['] compensation insurance [at] grossly inflated premiums.

Id. at ¶¶ 11–12. AIM developed the Program for the purpose of affording PEOs the opportunity "to be able to obtain affordable workers['] compensation coverage for their employer clients." Id. at ¶ 14. None of the Plaintiffs, however, are qualified insurance companies. Id. at ¶ 16. Therefore, in order to implement the Program, AIM "was required to enter into an agreement with an insurance company [] licensed to do business as an insurer in the several states in which AIM sought to market worker's compensation coverage[.]" Id.

In late 2003, AIM's President and CEO David Dennett-Smith and Vice President for Underwriting Bruce Holley were introduced to Guarantee's CEO Steven Mariano and President Lucia Tompkins. See May 24, 2010 Arbitration Hr'g Tr. 38:6–12, 47:19–48:4, 74:20–75:1, ECF No. 54-40. Guarantee began writing policies for "traditional" workers' compensation coverage in January 2004, but it was interested in selling coverage outside of the traditional workers' compensation market, including to PEOs. See Apr. 8, 2010 Arbitration Hr'g Tr. 10:20–11:15, 12:7–19, ECF No. 54-38. However, at the time that Mr. Dennett-Smith and Mr. Holley met Mr. Mariano and Ms. Tompkins, Guarantee's reinsurance coverage excluded the sale of workers'

compensation coverage to PEOs.  Id.

On March 12, 2004, "AIM entered into a 'Producer Agreement' with . . . Guarantee to provide for the sale of workers['] compensation coverage by [Guarantee] to PEOs" (the "Producer Agreement" or "Agreement").  Am. Compl. ¶ 18, ECF No. 25.[1]  Pursuant to the terms of the Agreement, AIM had "the exclusive and sole authority to solicit applications under the [PEO] program with [Guarantee] for policies of workers' compensation insurance[.]" Producer Agreement § I(A), ECF No. 54-10.  Guarantee was required to pay AIM certain commissions, fees, and expenses with respect to insurance policies procured by AIM and bound by Guarantee during the first year of the Agreement.  See id. at Schedule A.  Thereafter, "prior to and as a condition of entering into each subsequent program year of the Program," Guarantee and AIM were to "mutually agree upon the commissions to be paid to [AIM.]"  Id. at § II(A).  If the parties could not agree on commissions after the first year, then the Agreement was subject to termination by written notice by either party to the other.  Id. at § VIII(M).[2]

---

[1]     On the same day that Guarantee signed the Producer Agreement it also entered into a series of agreements with AIM and other parties, the practical effect of which were to provide Guarantee with reinsurance and a source of surplus capital that would enable Guarantee to begin writing policies for workers' compensation insurance to PEOs.  See Arbitrator's Decision ¶ 17, ECF No. 54-3.

[2]     The Agreement also contained several other grounds for its termination.  For example, either party could terminate for no reason upon not less than 365 days advance written notice to the other party, Producer Agreement § VIII(A), ECF No. 54-10; Guarantee could terminate, "immediately upon written notice to [AIM], in the event that any public authority suspends, revokes or refuses to renew any of [AIM's] producer licenses," id. at § VIII(C); Guarantee could terminate, "immediately upon written notice to [AIM], in the event [AIM] . . . breach[es] any . . . provision of this Agreement and fail[s] to cure such breach of such . . . provision within ten (10) days[] after [Guarantee's] written notice to [AIM]," id. at § VIII(D); Guarantee could terminate "immediately upon written notice to [AIM], in the event of [AIM's] . . . willful misconduct, abuse of authority, fraud

AIM made several representations and warranties under the Agreement, including that AIM's insurance producer's license was then and would remain, "at all times during the term of this Agreement . . . in full force and in effect in the State of [its] domicile," id. at § I(G)(1), and "at all times during the term of this Agreement, [AIM] shall be duly licensed as an insurance provider in each State where [it] solicit[s] applications for policies of the types of insurance [covered by the Agreement]," id. at § I(G)(2). AIM further agreed that, "in the event acceptable evidence of [its] relevant current licensing is not on file with [Guarantee], and such evidence is not provided to [Guarantee] within 30 days of written notice to [AIM], [Guarantee] shall have the right, title and interest in and to commissions paid or otherwise due [AIM]." Id. at § I(H).

The Producer Agreement further provided that the parties intended that the Agreement "be enforceable in accordance with the Federal Arbitration Act (9 U.S.C. Section 1, et seq.) (the ['FAA' or] 'Act')[.]" Id. at §§ XVIII(A). "In the event that either party refuses to submit to arbitration," the other party could request that a United States Federal District Court compel arbitration. Id. The parties were to "mutually agree on a single arbitrator to preside at the arbitration . . . . [who] shall be an active or retired executive of an insurance or reinsurance company or Lloyd's of London Underwriters, and the arbitrator shall have no personal or financial interest in the result of the arbitration." Id. at § XVIII(C). The parties agreed that

> [t]he arbitrator shall not be obliged to follow judicial formalities or the rules of

---

> or material misrepresentation," id. at § VIII(F); and Guarantee could terminate "immediately upon written notice to [AIM], in the event of the commission of any of the following acts by [AIM] or [AIM's] officers, directors or other members of management: fraud, gross negligence, or willful misconduct (which includes without limitation willful violation of instructions, or willful violation of any covenant of this Agreement or any statutory provision or Department of Insurance regulation)," id. at § VIII(H).

4

> evidence except to the extent required by governing law, that is, the state law of the situs of the arbitration as herein agreed; and the arbitrator shall make his or her decision according to the practice of the insurance or reinsurance business, as applicable.

Id. at § XVIII(D).  Except as otherwise provided, "arbitration shall be based, insofar as applicable, upon the Commercial Arbitration Rules of the American Arbitration Association [(the 'AAA Rules')]." Id. at § XVIII(F).

Sometime in mid- to late-March 2004, either contemporaneously with or shortly after the parties entered into the Producer Agreement, regulators from the State of Missouri contacted Guarantee seeking documents as part of an investigation into suspected unlawful insurance activity by AIM.  See ECF No. 63-18.  In July 2004 the State of Missouri filed a petition in the Circuit Court of St. Francois County, Missouri against several defendants, including AIM and individually, Mr. Dennett-Smith and Mr. Holley, seeking to enjoin them from engaging in allegedly fraudulent practices "in connection with the sale of purported workers['] compensation insurance" in Missouri. See ECF No. 63-20 at 6.[3]

Separately, in April 2004, Guarantee was served by the Texas Department of Insurance ("TDI") with a request for information pertaining to an investigation of AIM on suspicion of similar violations of the insurance laws in Texas.  See ECF No. 63-22.  In July 2004, TDI sent AIM's

---

[3]      On May 26, 2006, the St. Francois County Circuit Court entered a final judgment against AIM, Mr. Dennett-Smith, and Mr. Holley, finding that they had "misrepresent[ed] to business clients . . . that they were covered by workers['] compensation insurance . . . when, in fact, . . . [no such] policies or certificates for . . . coverage [were issued]," "engag[ed] in the unfair practice of receiving payment for workers['] compensation insurance coverage, when, in fact, such coverage was not provided," and "engag[ed] in the unfair practice of issuing workers['] compensation insurance certificates to . . . clients when none of the AIM Defendants were licensed to sell insurance in the State of Missouri."  Final J. 12–13, ECF No. 63-24.

5

President, Mr. Dennett-Smith, a letter advising him that TDI had submitted a report to the Commissioner of Insurance alleging that "AIM has violated the Texas Insurance Code and its related rules[.]" July 14, 2004 Letter to Dennett-Smith From Michael Rigby, TGI Staff Attorney 1, ECF No. 63-21. The letter advised that TDI "[s]taff has recommended that AIM (1) cease and desist conducting the business of insurance in the State of Texas, (2) disgorge all profits realized from the unauthorized activity, and (3) pay an administrative penalty up to and including $25,000 per violation[.]" Id. On November 22, 2004, the Texas State Commissioner of Insurance issued an official order finding that AIM had violated multiple provisions of Texas insurance law. See Official Order, ECF No. 63-23. The Commissioner ordered AIM to "cease and desist conducting the business of insurance in the State of Texas," and pay an administrative penalty of $2,000,000. Id. at 4.

In the Fall of 2004, Guarantee notified AIM, by letter sent by certified mail return receipt requested to Mr. Dennett-Smith, that it was terminating the Producer Agreement, effective immediately. See 2004 Letter to Dennett-Smith from Tompkins, ECF No. 63-26.[4] Guarantee advised that the basis for the termination was

> failure by AIM to provide Guarantee evidence of its certificate of insurance for errors and omissions coverage as required by Section I(F) and for failure by AIM to provide Guarantee evidence of holding proper insurance licenses as required by Section I(G)(1), (2) and (3) and Section VII(C).

Id. As authority for its right to terminate, Guarantee's letter cited the provisions for termination

---

[4]    The letter is dated "Date, 2004." See ECF No. 63-26 at 2. Defendants advise that the letter was sent in the Fall of 2004; Plaintiffs do not dispute this. See Defs.' Resp. 11, ECF No. 63.

found in Section VIII of the Producer Agreement, subsections (C) and (H).[5]  On December 31, 2004, AIM allowed its Georgia resident's license to expire.  See ECF No. 63-32 at 6.

This matter was originally filed by Plaintiffs on May 4, 2007 in the Court of Common Pleas for Barnwell County, South Carolina.  See State Ct. Compl., ECF No. 1-1 at 4.  It was removed by Defendants on June 8, 2007 on the basis of diversity jurisdiction.  See Notice of Removal 1, ECF No. 1.  Plaintiffs filed the currently governing Amended Complaint on July 27, 2007.  Plaintiffs allege that, after terminating the Agreement, Defendants continued to use the Program that AIM had developed to write premiums for PEO workers' compensation coverage, without compensating AIM.  Specifically, Plaintiffs assert claims for violation of the South Carolina Trade Secrets Act, Am. Compl. ¶¶ 28–36, ECF No. 25; breach of contract, id. at ¶¶ 37–41; and breach of contract accompanied by a fraudulent act, id. at ¶¶ 42–48.  On July 9, 2007 Defendants moved to stay these proceedings pending a resolution of Defendants' motion to compel arbitration under the FAA.  ECF No. 15.  On August 10, 2007 Defendants submitted a status report to the Court advising that

---

[5]     Subsection (C) gave Guarantee the right to terminate "immediately upon written notice to [AIM], in the event that any public authority suspends, revokes or refuses to renew any of [AIM's] producer licenses, as applicable."  Producer Agreement § VIII(C), ECF No. 54-10.

Subsection (H) gave Guarantee the right to terminate

> immediately upon written notice to [AIM], in the event of the commission of any of the following acts by [AIM] or any of [AIM's] officers, directors, or other members of management: fraud, gross negligence or willful misconduct (which includes without limitation willful violation of instructions, or willful violation of any covenant of this Agreement or any statutory provision or Department of Insurance regulation).

Id. at § VIII(H).

7

"Plaintiffs' counsel has indicated to counsel for the Defendants that the Plaintiffs are agreeable to submitting all claims and matters in dispute between the parties to arbitration and staying all proceedings." Defs.' Status Report 1, ECF No. 35. The Court entered a consent order staying the case pursuant to the parties' agreement "to submit all matters in dispute between the parties, including all claims in [the instant action] to arbitration" on August 14, 2007. Consent Order, ECF No. 36. Thereafter, the parties filed regular status reports advising the Court on the status of the arbitration. See ECF Nos. 37, 41, 43, 45, 47, 50, 51, 52 & 53.

The parties selected William D. Hager, President of Insurance Metrics Corporation in Boca, Raton, Florida to serve as the arbitrator. After multiple delays, the arbitration hearing was held over the course of several days in April and May 2010. Arbitrator's Decision ¶ 7, ECF No. 54-3. The final post-hearing briefs were submitted on July 26, 2010. See Status Report 1, ECF No. 53. The arbitrator issued his decision on August 20, 2010. It is six pages long and expressly provides that it is not a "reasoned" decision, as that term is understood within the AAA Rules. Arbitrator's Decision ¶ 6, ECF No. 54-3.[6] Among the findings set forth therein are that:

- "The AIM program was early in its existence during the period of time at issue and was not without its own problems that long term would have created complications, even if the arrangement had continued long term between AIM and Guarantee. . . . Nonetheless, AIM had in fact identified and begun putting in place the most important keys to opening the door to the provision of workers['] compensation to PEOs at that time and in that market." Id. at ¶¶ 21–22.

- Guarantee "had not fashioned such a plan or formulated such a plan consisting of these key elements prior to working with AIM," but "[o]nce Guarantee understood AIM's plan inclusive of these keys and the other

---

[6]     A "reasoned award" is "something short of findings and conclusions but more than a simple result." Holden v. Deloitte & Touche LLP, 390 F.Supp.2d 752, 780 (N.D. Ill. 2005).

elements, Guarantee captured the essence of the AIM plan, made it their own and jettisoned their relationship with AIM, and diverted the related business opportunity from AIM to Patriot on through to Guarantee." Id. at ¶¶ 24–25.

- Guarantee alone was liable for the actions described above; Lucia Tompkins Steven Mariano and Patriot Insurance Management Company, Inc. bear no liability for any of the matters alleged in the arbitration. Id. at ¶¶ 10–13.

- "Based on the totality of facts, law, circumstances and other considerations," the arbitrator ordered that Plaintiffs were to be awarded $490,000 in damages to be paid by Guarantee. The arbitrator declined to award any punitive damages or any other kind of relief. Id. at 6.

As previously stated, this matter is presently before the Court on Plaintiffs' motion to vacate or modify the arbitration award, filed on November 20, 2010, ECF No. 54, and Defendants' motion to confirm the award, filed on December 22, 2010, ECF No. 59. Both motions are fully briefed and ready for decision.

## II.     LEGAL STANDARD

Where parties have agreed to submit to arbitration under the FAA, a party may "ask a court to review the arbitrator's decision, but the court will set that decision aside only in very unusual circumstances." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942 (1995). The Fourth Circuit has observed that "the scope of judicial review for an arbitrator's decision 'is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation.'" Three S Delaware, Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007) (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc., 142 F.3d 188, 193 (4th Cir. 1998)). "Thus, in reviewing arbitral awards, a district . . . court is limited to determining 'whether the arbitrators did the job they were told to do—not whether they did it well,

or correctly, or reasonably, but simply whether they did it.'" Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union, 973 F.2d 276, 281 (4th Cir. 1992)); see also Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account, 618 F.3d 277, 296 (3d Cir. 2010) ("[W]e do not act to 'correct factual or legal errors made by an arbitrator,' and we will uphold an award even if the arbitrator engaged in 'improvident, even silly, factfinding[.]'") (quoting Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 279–80 (3d Cir. 2004)).

The FAA only authorizes a district court to vacate an award on a matter properly submitted to arbitration on the following limited grounds:

(1)    where the award was procured by corruption, fraud, or undue means;

(2)    where there was evident partiality or corruption in the arbitrators . . . ;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  These "four grounds . . . restate the longstanding rule that, '[i]f [an arbitration] award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court . . . will not set [the award] aside for error, either in law or fact." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., – U.S. –, 130 S.Ct. 1758, 1780 (2010) (quoting Burchell v. Marsh, 58 U.S. 344, 349 (1855)) (alterations in original).

III.    **ANALYSIS**

     **A.    Plaintiffs' Motion To Vacate Or Modify The Award Is Timely.**

As an initial matter, Defendants argue that Plaintiffs' motion to vacate or modify the arbitration award is untimely. Under the South Carolina Uniform Arbitration Act (the "UAA"), a motion to vacate or modify an arbitration award "shall be made within ninety days after delivery of a copy of the award to the applicant[.]" S.C. Code Ann. § 15-48-130(b). In contrast, under the FAA, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. In this case, the arbitrator's award was delivered to the parties on August 20, 2010 via electronic mail. See ECF No. 63-2 at 9. Plaintiffs' motion was filed with this Court and served on Defendants on November 20, 2010, exactly three months or 92 days after the award was delivered to Plaintiffs. Thus, a determination as to whether Plaintiffs' motion was timely depends on whether South Carolina or Federal law governs the applicable statute of limitations.

Defendants argue that the limitations period under the UAA applies, because "[e]ach of the agreements at issue in this case contains a provision designating South Carolina law as the applicable governing law." Defs.' Resp. 19, ECF No. 63. Specifically, the Producer Agreement's "Applicable Law" provision states:

> If any question arises at any time as to the validity, construction, interpretation or performance of this Agreement in any court of the State of South Carolina or any other state or country, the laws of the State of South Carolina shall govern and control without regard to conflicts of laws principles.

Producer Agreement § XIX, ECF No. 54-10.

However, the Producer Agreement also contains another provision that reads: "The parties

11

intend this Paragraph XIX to be enforceable in accordance with the [FAA] . . . <u>notwithstanding</u> any other choice of law provision set forth in this Agreement." <u>Id.</u> at § XVIII(A) (emphasis added). As such, the plain language of the Producer Agreement clearly evidences the intention of the parties that the FAA apply, "notwithstanding" the choice of law language in Paragraph XIX, which might otherwise seem to require a different result. Plaintiffs' motion was therefore timely.

    **B.    Plaintiffs Fail To Demonstrate That Grounds Exist Under The FAA For Vacating Or Modifying The Arbitrator's Decision.**

Plaintiffs seek vacation or modification of the Arbitrator's award on several bases, each of which are addressed in turn, below.

        **1.    <u>Plaintiffs' claim that the arbitrator's award was "fundamentally unfair" or "irrational" and therefore must be vacated pursuant to 9 U.S.C. §§ 10(a)(3) or (4) is without merit.</u>**

Plaintiffs argue, first, that the arbitrator's award must be vacated pursuant to 9 U.S.C. § 10(a)(3) because the award was "fundamentally unfair" to AIM and "completely arbitrary and irrational" given the arbitrator's finding of "intentional and admitted fraudulent conduct by Defendants." Pls.' Mot. To Vacate or Modify 31, ECF No. 54-1. Specifically, Plaintiffs take the position that the arbitrator's finding that Guarantee "captured the essence of the AIM plan, made it their own and jettisoned their relationship with AIM, and diverted the related business opportunity from AIM," amounted to a finding that Guarantee "stole AIM's business plan[.]" <u>Id.</u> at 32. Plaintiffs argue that, under South Carolina law, such a finding <u>requires</u> the imposition of a constructive trust. <u>Id.</u> at 22. Therefore, Plaintiffs contend that the arbitrator's failure to impose such a remedy made the award fundamentally irrational. In addition or in the alternative, Plaintiffs also argue that Guarantee's CEO, Mr. Mariano, admitted to committing fraud and, therefore, the

arbitrator was required to have imposed much more substantial damages under the appropriate measure of damages "for fraudulent breach of contract." Id.

As an initial matter, an argument that an arbitration decision should be vacated based on "irrationality," is more properly made under 9 U.S.C. § 10(a)(4), which addresses vacation on the grounds that an arbitrator exceeded its powers. See Ario, 618 F.3d at 295. Even then, "[t]he question under [Section 10(a)(4)] is 'whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue.'" Stolt-Nielsen, 130 S.Ct. at 1780 (quoting DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 824 (2d Cir. 1997)). Consistent with this highly deferential standard, in considering a challenge to an arbitrator's decision based on alleged "irrationality," the Court "review[s] the form of the relief awarded . . . to 'determine if the form of the . . . award can be rationally derived either from the agreement between the parties or from the parties['] submissions to the arbitrators,'" and will not revise the terms of the award "unless they are 'completely irrational.'" Ario, 618 F.3d at 295 (quoting Mut. Fire, Marine & Island Ins. Co. v. Norad Reins. Co., 868 F.2d 52, 56 (3d Cir. 1989)). In fact, the "irrationality" standard under the FAA is so deferential, "that we 'may not overrule an arbitrator simply because [we] disagree . . . . [T]here must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award.'" Id. at 295–96 (quoting United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 379 (3d Cir. 1995)) (alterations in original).

Plaintiffs have failed to demonstrate that there is no support in the record for the arbitrator's award. First, Plaintiffs' argument that the arbitrator's liability decision is incompatible with the amount of damages awarded ignores that the arbitrator's decision was not a "reasoned" decision.

13

Pursuant to the parties' agreement, the AAA Rules governed. Under AAA Rule 42(b), "[t]he arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator decides that a reasoned award is appropriate." American Arbitration Association, Commercial Arbitration Rules, http://www.adr.org/sp.asp?id=22440#R42 (last visited Mar. 25, 2011). In this case, neither party requested a reasoned award in writing prior to appointment of the arbitrator, so none was mandated.[7] The arbitrator, therefore, was only required to set forth his ultimate conclusion and need not have included any underlying analysis. See Holden, 340 F.Supp.2d at 780.

On the one hand, Plaintiffs argue that the arbitrator made specific findings about Defendants' liability that required the imposition of an unspecified threshold level of damages, which was not met by the award imposed.[8] On the other hand, Plaintiffs complain that the arbitrator's decision failed to set forth any basis for the amount of damages that were awarded. Plaintiffs' argument as to the precise nature of the arbitrator's liability findings, however, necessarily relies on a particular interpretation of the basis for the arbitrator's findings, which is not supported by the decision. Indeed, at the hearing, Plaintiffs' counsel argued that the arbitrator's finding on liability was

---

[7]    At the beginning of the arbitration hearing, Defendants requested that the arbitrator issue a reasoned award, but Plaintiffs took the position that whether the arbitrator wished to issue a reasoned award was "up to [the arbitrator]." May 25, 2010 Arbitration Hr'g Tr. 117:10–21, ECF No. 54-41 at 30. The Fourth Circuit has affirmatively held that a district court does not abuse its discretion in denying a motion to remand a matter to an arbitrator for failure to issue a reasoned award where a party requested the reasoned award during the hearing and not prior to the appointment of the arbitrator, as required by the AAA Rules. MCI Constructors, LLC v. City of Greensboro, 610 F.3d 849, 864 (4th Cir. 2010).

[8]    At the hearing, Plaintiffs' counsel was unable to tell the Court what amount of damages his clients would have deemed "rational."

"reasoned," in that the arbitrator offered some reasons for his decision. That argument, however, is incompatible with the plain language of the decision itself, which expressly characterizes the decision as not a reasoned decision. Arbitrator's Decision ¶ 6, ECF No. 54-3.

Even if the arbitrator's decision was "reasoned," the Court does not agree with Plaintiffs that the only possible interpretation of the decision is that the arbitrator found that Guarantee "stole AIM's business plan." Indeed, Plaintiffs' argument implicitly ignores another "finding" made by the arbitrator: namely, that "[t]he AIM program was early in its existence during the period of time at issue and was not without its own problems that long term would have created complications, even if the arrangement had continued long term between AIM and Guarantee[.]" Arbitrator's Decision ¶ 21, ECF No. 54-3. In other words, the arbitrator explicitly concluded that, although AIM had "identified and begun putting into place the most important keys to opening the door to the provision of workers['] compensation to PEOs at that time and in that market," id. at ¶ 22, the Program that AIM developed had faults and would therefore likely need to be modified in order to be successful in the long term. This conclusion could have influenced the arbitrator's decision about the appropriate amount of the award.

Nor does the Court agree with Plaintiffs that Mr. Mariano "admitted" to committing fraud. This assertion by Plaintiffs is based entirely on an exchange that took place between Mr. Mariano and Plaintiffs' counsel, James L. Ford, while Mr. Mariano was being cross-examined at the arbitration hearing. That exchange is reproduced in its entirety here:

Q.         Is it your business philosophy, Mr. Mariano, that you can enter into one contract with one party and if you decide you don't like the terms of that contract, you can just abandon that contract and enter into another contract with another party; is that how you do business?

| | |
|---|---|
| A. | I don't believe so. |
| Q. | That's not good business, is it? |
| A. | I don't think so. |
| Q. | That's bad faith isn't it? |
| A. | You know what— |
| MR. OUZTS: | Objection to the form of the question. |
| THE WITNESS: | I believe that reinsurance contracts— |
| ARBITRATOR: | Overruled.  You may answer. |
| BY MR. FORD: | That's bad faith, isn't it, Mr. Mariano? |
| A. | Fraud's bad faith. |
| Q. | Sir? |
| A. | Fraud is bad faith. |
| Q. | It is bad faith? |
| A. | Is real bad faith. |

May 24, 2010 Arbitration Hr'g Tr. 110:4–111:3, ECF No. 54-40 at 29.  Defendants argue that this was

> a testy exchange between Plaintiffs' counsel and Mr. Mariano . . . .  In an angry retort to a question meant to insinuate that Mr. Mariano had acted in bad faith, Mr. Mariano said, "Fraud's bad faith," . . . .  Anyone present in the hearing room that day would have understood that Mr. Mariano's curt retort was intended, not as an admission, but as an accusation of fraud against AIM.  The evidentiary record and Defendants' post-arbitration briefs are replete with evidence of what Mr. Mariano and the other Defendants considered to be fraudulent misconduct on the part of AIM.

Defs.' Resp. 29–30, ECF No. 63.  Even without the aid of context, the record as written does not evidence an admission by Mr. Mariano that he engaged in fraud, only that he believes that fraud is

equivalent to "bad faith."

Even if the arbitrator had made the findings that Plaintiffs urge, Plaintiffs' argument that any decision that did not impose a constructive trust was "irrational" is not supported by the law. The remedy of constructive trust "is a flexible equitable remedy whose enforcement is subject to the equitable discretion of the trial court." Hale v. Finn, 694 S.E.2d 51, 90 (S.C. Ct. App. 2010) (emphasis added). Before a constructive trust may be properly imposed, there must be "clear and convincing" evidence that "a party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it[.]" SSI Med. Servs., Inc. v. Cox, 392 S.E.2d 789, 793–94 (S.C. 1990). Plaintiffs cite nothing that would require the imposition of a constructive trust on the record here and the Court is satisfied that the arbitrator could have properly found that no constructive trust was warranted.

However, in order to uphold the arbitrator's award the Court need only find that the form of the award can be rationally derived either from the agreement between the parties or from the parties' submissions to the arbitrator. Ario, 618 F.3d at 296; see also MCI Constructors, 610 F.3d at 862–63 ("It is well settled that arbitrators are not required to disclose the basis upon which their awards are made and courts will not look behind a lump-sum award in an attempt to analyze their reasoning process.") (citing cases). Provided that the parties were given a full and fair hearing and there is some support in the record for the arbitrator's award, the Court "will not set [the award] aside for error, either in law or fact." Stolt-Nielsen, 130 S.Ct. at 1780 (alteration in original) (emphasis added). See also U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2010) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority; that a court is convinced he committed serious error does

17

not suffice to overturn his decision.") (quoting <u>United Paperworkers Int'l Union v. Misco, Inc.</u>, 484 U.S. 29, 38 (1997)).

There is ample support in the record for the arbitrator's decision that, despite Guarantee's liability, Plaintiffs were not entitled to the unspecified, but more significant, damages award that they sought. There was evidence before the arbitrator that AIM was in breach of the Producer Agreement or, alternatively, had engaged in conduct in Missouri and Texas that justified Guarantee in terminating the Agreement. Even if the arbitrator did not believe that AIM's conduct justified Guarantee's termination of the Agreement and subsequent actions, there was ample evidence in the record to support a decision by the arbitrator to limit damages to reflect the strong possibility that the parties would have been bound by the Agreement for only a limited time. As noted above, by its terms, the Producer Agreement would automatically be terminated after one year if the parties were unable to agree on commissions to be paid to AIM after the first year. Producer Agreement § VIII(M), ECF No. 54-10. It also permitted termination by either party on no grounds at all, with 365-days notice. <u>See</u> <u>id.</u> at § VIII(A). The arbitrator may have also found it significant that as of January 1, 2005, AIM was no longer licensed to solicit insurance in its home state and, therefore, could not have performed under the Agreement as written. As for Plaintiffs' argument that it is not commissions that it is after, but rather damages for misappropriation of its "trade secrets," the arbitrator's decision indicated that, by his assessment, AIM's Program was not without its drawbacks. <u>See</u> Arbitrator's Decision ¶ 21, ECF No. 54-3. That, also, could have influenced the arbitrator's decision to fashion the award that he did. As previously explained, the Court need not determine precisely what the arbitrator found, only that there is some basis for it in the record. Plaintiffs' motion to vacate on the grounds that the award is irrational is denied.

2.    **Plaintiffs' claim that the arbitrator was "evidentially partial" and therefore the award must be vacated pursuant to 9 U.S.C. § 10(a)(2) is without basis.**

For the same reasons set forth above, the Court similarly rejects Plaintiffs' argument that the award should be vacated pursuant to 9 U.S.C. § 10(a)(2), which permits vacation "where there was evident partiality or corruption in the arbitrators . . . ." 9 U.S.C. § 10(a)(2). Plaintiffs argue that this section applies, because the only possible explanation for the arbitrator's "woefully inadequate compensation award" is that the arbitrator's decision must have been infected by his "evident partiality." Pls.' Mot. To Vacate or Modify 33, ECF No. 54-1.

Even if the Court had not found that there is basis in the record for the award, the burden for a party that seeks "vacation of an arbitration award due to 'evident partiality' is heavy," and "[t]he alleged partiality must be 'direct, definite, and capable of demonstration rather than remote, uncertain or speculative.'" Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 146 (4th Cir. 1993) (quoting Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173–74 (2d Cir. 1984)). Plaintiffs, however, cite to nothing direct, definite, or capable of demonstration, other than their own contention that the damages award did not correlate to the arbitrator's liability findings. A similar argument was rejected by the Sixth Circuit in one of the cases that Plaintiffs cite in support of their motion;[9] this Court similarly rejects Plaintiffs' argument.

3.    **The record does not support Plaintiffs' claim that the arbitrator ignored Plaintiffs' request for an accounting**.

Plaintiffs also contend that the award is faulty because, "[t]he arbitrator completely ignored

---

[9]    See Dawahare v. Spencer, 210 F.3d 666, 669 (6th Cir. 2000) ("Because [plaintiff] points to nothing but the amount of the award to establish evident partiality, there is no basis to vacate the award [under 9 U.S.C. § 10 (a)].").

Plaintiffs' request for an accounting and then entered a completely irrational award that has no basis from [sic] the evidence." Pls.' Mot. To Vacate or Modify 35, ECF No. 54-1. The record does not support this claim.

As reflected by electronic correspondence between the arbitrator and the parties, Plaintiffs' counsel submitted the motion for an accounting on January 14, 2010. See ECF No. 63-37 at 2. Based on representations from Plaintiffs' counsel that the parties were attempting to reach a negotiated resolution of the motion, the arbitrator advised the parties on January 23, 2010, "I will pend my ruling/order for the time being. I am happy to rule as soon as I understand that negotiations are not working." Id. at 10. There is no evidence that Plaintiffs raised the issue again until the arbitration hearing, when they submitted an accounting as a claim for equitable relief. Plaintiffs also briefly discussed their request for an accounting in their Post-Arbitration Memorandum (submitted before the arbitrator issued his decision), in which Plaintiffs advised that "[w]hether or not to conduct an accounting . . . is a matter of the arbitrator's discretion." Pls.' Post-Arbitration Mem. 68, ECF No. 54-33 (emphasis added). The arbitrator exercised that discretion when he expressly denied all of Plaintiffs' requests for any form of additional relief beyond the money damages awarded in his decision. See Arbitrator's Decision 6, ECF No. 63-2 ("No punitive damages are awarded and no other relief of any kind is awarded."). Accordingly, the Court will not vacate the award on this basis.

### 4. The individual Defendants consented to arbitration of their personal liability by actively engaging in the arbitration proceedings.

Lastly, Plaintiffs argue in their motion to vacate or modify the award that the parties never agreed to submit the issue of the corporate officers' personal liability to arbitration; therefore, to the extent that the arbitrator purported to decide the personal liability of Defendants Mr. Mariano, Ms.

20

Tompkins, or Tarheel Insurance Management Company,[10] it was without authority and should be vacated pursuant to 9 U.S.C. § 10(a)(4). See Pls.' Mot. To Vacate or Modify 36–38, ECF No. 54-1. In their response in opposition to Defendants' motion to confirm the arbitration award, Plaintiffs appear to take a different approach: instead of continuing to argue that the arbitrator should never have ruled on the individual Defendants' liability at all, Plaintiffs argue that the arbitrator's decision that Mr. Mariano was not liable was not supported by the law. See Pls.' Resp. 13–14, ECF No. 69. The only evidence that Plaintiffs cite in support of this contention is to again reference the exchange between Mr. Mariano and Plaintiffs' counsel reproduced above, in which Plaintiffs contend Mr. Mariano "admitted . . . that he had engaged in a fraud to steal the AIM business opportunity." Id. at 16.

Plaintiffs' first argument, that because the individual defendants were not signatories to the Producer Agreement the arbitrator was without authority to decide their liability, is without merit for the reasons discussed in the Fourth Circuit's decision in Rock-Tenn Company v. United Paperworkers International Union, AFL-CIO, 184 F.3d 330 (4th Cir. 1999).  In that case as in the instant one, the parties voluntarily submitted "all matters in dispute between the parties," including the individual defendants' liability, to arbitration.  See Consent Order 1, ECF No. 36.  At no time prior to entry of the award did any of the parties raise any objection to the arbitrability of the issue. To the contrary, both parties "vigorous[ly] participat[ed]" in the debate over the merits of the individual defendants' liability during the arbitration hearing.  See Rock-Tenn, 184 F.3d at 334; see also, e.g., Pls.' Arbitration Br. 58–59, ECF No. 54-32 (arguing that the individual Defendants "are

_____

[10]    On July 27, 2007 Defendant Patriot Insurance Management Company, Inc. was substituted for Defendant Tarheel Insurance Management Company as per Plaintiffs' Amended Complaint.  See ECF Nos. 25, 29.

personally liable for the wrongs committed against AIM"); Pls.' Post-Arbitration Mem. 61–62, ECF No. 54-33 (same). As the Fourth Circuit held in <u>Rock-Tenn</u>, "such unconditional submission of an issue to arbitration, without any objection to the arbitrator's authority to decide that issue 'cede[s]' authority to the arbitrator, or represents 'consent' to arbitration of that issue." <u>Rock-Tenn</u>, 184 F.3d at 334 (citing <u>Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union</u>, 973 F.2d 276, 280 (4th Cir. 1992)) (alteration in original). "In such circumstances 'there is no justification for drawing the inference that the arbitrator may have exceeded his authority.'" <u>Id.</u> (citing cases).

As to Plaintiffs' second theory, that the arbitrator's decision that Mr. Mariano was not liable was not supported by the law given Mr. Mariano's "admission" that he committed fraud, as discussed <u>supra</u>, the Court does not agree that Mr. Mariano admitted to committing fraud or that the arbitrator's decision was irrational. This argument, therefore, is similarly rejected.

## IV.    **CONCLUSION**

For the reasons discussed above, the court **DENIES** Plaintiffs' motion to vacate or modify the arbitration award, ECF No. 54, and **GRANTS** Defendants' motion for judgment based on the arbitrator's decision, ECF No. 59.

IT IS ORDERED.

/s/ Margaret B. Seymour
United States District Judge

March 29, 2011
Columbia, South Carolina